UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Central Division)

| | |
|---|---|
| In re:<br><br>LEVER DEVELOPMENT, LLC,<br><br>Alleged Debtor. | Chapter 7<br><br>Case No. 11-44639-MSH |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON CONTESTED
INVOLUNTARY PETITION**

Lever Development, LLC, the alleged debtor ("Lever"), contests an involuntary chapter 7 petition filed against it by Laushine Enterprises, LLC ("Laushine"), Harvey Building Products ("Harvey") and West Gloucester Capital, LLC ("WGC") on the grounds that the claim held by WGC is subject to bona fide dispute. Based on the evidence presented at a two day trial, matters of record of which I may take judicial notice and the parties' written submissions, I hereby render my findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this contested matter by Fed. R. Bank. P. 7052 and Fed. R. Bankr. P. 9014(c).

**Findings of Facts**

1. The Village of West Gloucester, LLC ("the Village") sought to develop a 34-unit adult condominium community known as The Village at West Gloucester on land it owned at 36 Atlantic Street in Gloucester, Massachusetts. (October 5, 2009 Colliers Meredith & Grew appraisal, D-5, p. 2[1])

2. On or about June 1, 2007, the Village hired Lever as its general contractor for the project.

---

[1] The petitioning creditors' trial exhibits are referred to as "P-#." Lever's trial exhibits are referred to as "D-#."

(Joint Pretrial Statement (docket # 29) Section VII-Statement of Facts Which Are Admitted (hereinafter "Admitted Facts") at ¶ 4)

3. To finance construction of the project the Village obtained loans from Digital Federal Credit Union ("DCU"). (P-1 to 4)

4. On or about June 11, 2007, the Village executed and delivered to DCU two notes as well as a construction loan agreement and related loan documents pursuant to which DCU loaned the Village a total of $7,900,000 for the project and received a mortgage on the Gloucester real estate and security interests in certain collateral. (P-1 and 2)

5. The first note (referred to as the Infrastructure Note) was in the original principal amount of $4,800,000.00; the second note (referred to as the Construction Note) was in the original principal amount of $3,100,000.[2] (P-1 A and B) Both notes were to mature on June 11, 2010. (*Id.*)

6. The Village's obligations under the notes were secured by a mortgage on the Gloucester real estate, as well as other collateral including the licenses, permits, and bonds related to the development of the condominium community. (P-1 and 2)

7. Among other things, the notes required the Village to fund and maintain a reserve account to be used by DCU to fund monthly interest payments under the notes (the "Interest Reserve Account"). In the event the balance in the Interest Reserve Account fell below $180,000 the Village was required to make interest payments directly to DCU. (P-1)

8. Brian Lever is or was the sole member and manager of the Village as well as the

---

[2]Both notes are titled "Construction Loan Note." The construction loan agreement, however, designates the $4,800,000 loan as the infrastructure loan and the $3,100,000 loan as the construction loan. (P-2, p.1)

2

    principal and managing member of Lever. (The Village of West Gloucester's bankruptcy docket, case no. 10-42000-MSH, Statement of Financial Affairs (docket # 25), question 21) (Testimony of Brian Lever[3]) (To avoid confusion, hereinafter Brian Lever will be referred to as Brian.)

9. Brian personally guaranteed the notes. (P-1)

10. The Village and DCU executed three amendments to the notes and other loan documents. The second amendment to the notes and to certain other loan documents was executed on July 24, 2008 at which time Lever executed an unlimited guaranty (the "Lever Guaranty") of the Infrastructure Note in favor of DCU. (P-10 and P-3)

11. Under the loan documents as amended, the Village was required to keep at least $150,000 in the Interest Reserve Account. (P-10, p. 3 ¶ 1)[4]

12. By July 2009, the Village was in default of its obligations under the amended loan documents. (P-10)

13. A Forbearance Agreement was negotiated and executed by the Village, Lever and Brian on or about July 22, 2009. (*Id.*)

14. The key provisions of the Forbearance Agreement were:

    a. Unit 3 of the project was to be sold by July 31, 2009, and either unit 2 or unit 7 was to be sold by December 31, 2009 (P-10 at ¶3);

---

[3] Brian Lever testified during the first day of trial. The transcript for the first trial day is not currently available.

[4] P-10 is a Forbearance Agreement which in paragraph 3 refers to the third amendment to the Infrastructure Note as requiring that the Interest Reserve Account minimum be $150,000. Both paragraph 3 of the third amendment to the Infrastructure Note and paragraph 2 of the Construction Note state that the minimum amount in the Interest Reserve Account is to be $250,000. (P-1) This discrepancy is not material to this decision and I will assume that the minimum balance required to be kept in the Interest Reserve Account was $150,000 when the Forbearance Agreement was signed.

    b. The Village was not to sell a unit for less than $700,000.00 without the prior written consent of DCU (P-10 at ¶4);

    c. DCU waived the Village's default for failure to keep the Interest Reserve Account above $150,000 (P-10 at¶1);

    d. The Interest Reserve Account was renamed the Reserve Account to be used to fund interest payments to DCU and to pay or reimburse the Village for its sales and marketing expenses up to $27,700 per month. The Reserve Account was at all times to contain a balance no less than $27,700 plus accrued interest under the notes (*Id.*);

    e. Brian's wife was to withdraw funds from her retirement account to pay certain identified payables incurred in connection with the project. (P-10 at¶ 12)

15. The Forbearance Agreement provided that all terms of the loan documents as amended remained in full force and effect. (P-10 at ¶28)

16. While the Forbearance Agreement did not establish a termination date, it did provide that "if the Borrower [the Village] shall fail to timely observe or perform any of the terms and conditions contained herein, the lender's obligations to forbear hereunder shall be null and void." (P-10 at ¶ 25)

17. By October 2009, the Village was in default under the Forbearance Agreement because the balance in the Reserve Account had dropped to $3,083.01, far less than the required minimum balance. (D-23, P-15 through P-20)

18. On or about November 18, 2009, DCU received an appraisal dated October 5, 2009, performed on its behalf by Karen Hanlon of Colliers Meredith & Grew, which established that the Village would be in default under the Forbearance Agreement

because the outstanding balance of the Village loan exceeded 75% of the appraised value of the real estate collateral.[5] (D-5 and tr. at 25-27)

19. The Arsenaults signed a reservation agreement to purchase unit 2 of the project on October 17, 2009. (D-6) They notified the Village that they could not close on the unit until they sold their home in Winchester and the Village informed DCU that a 2009 closing of unit 2 was unlikely. (D-7)(P-22) The Village proposed a 2009 sale to the Arsenaults with a lease back of the unit to the Village for use as a model unit until the sale of the Arsenaults' Winchester property could be arranged. (P-22)

20. The Burkes signed a purchase and sale agreement on November 7, 2009, to purchase unit 8[6] of the project for a purchase price of $600,000 with a closing on May 31, 2010. (D-14)

21. On December 1, 2009 DCU issued its notice to the Village, Lever and Brian of their default under the notes, loan documents and the Forbearance Agreement. (D-23)

22. On or about September 30, 2009, Lawrence Smith, the managing director of Restoration Capital RC5, LLC, a predecessor in interest and affiliate of WGC,[7] initiated an inquiry to DCU about opportunities to purchase any of DCU's non-performing loans. (D-4).

---

[5] This loan to value requirement was set forth in the original loan documents and was not affected by the Forbearance Agreement except insofar as the Forbearance Agreement confirmed that the Village remained bound by all its previous agreements and undertakings, any breach of which would be an event of default. Under the loan documents, if the loan to value ratio requirement was breached the Village would have fifteen days from notification of the breach to pay down the loan to bring the loan to value ratio back into compliance. (P-2 at ¶ 9) the Village received notice of the loan to value ratio imbalance and of the fifteen day cure requirement on December 1, 2009. (D-23)

[6] I have assumed that the fact that the Village tried to sell unit 8 rather than unit 7 as called for in the Forbearance Agreement is immaterial to this dispute.

[7] In addition to Restoration Capital RC5, LLC, another affiliate of WGC, RC6, LLC, also was involved in the process that led ultimately to WCG's acquisition of the Village loan. Mr. Smith was an officer of all these entities. For simplicity sake, all reference to WGC are intended to include these affiliated entities where appropriate.

5

23. On or about October 28, 2009, WGC executed a confidentiality agreement with respect to the possible purchase of the Village loan. ( D-11)

24. On November 11, 2009, DCU notified Mr. Smith that it would entertain offers to purchase the Village loan. (D-15)

25. Due diligence materials with respect to the Village loan were delivered by DCU to Mr. Smith on December 2, 2009. (D-24).

26. At trial, Paul Carey, a vice-president of DCU and one of the loan officers assigned to the Village loan, credibly testified, and I find, that (i) DCU solicited offers to purchase the Village loan from approximately six parties in addition to WGC and (ii) it is DCU's policy not to offer its borrowers the opportunity to purchase their loans at a discount.[8]

27. Mark Harriman, a senior commercial lender for DCU and one of the loan officers assigned to the Village loan, credibly testified at trial, and I find, that DCU received no offers for the Village loan other than from WGC. (Docket # 46-Transcript of second day of trial at p. 71 (hereinafter cited as "Tr. at _") )

28. Mr. Harriman credibly testified, and I find, that DCU does not, as a matter of policy, require that a loan be in default before it will sell the loan. Mr. Harriman also credibly testified, and I find, that he was unaware of any requirement that the Village loan be in default before DCU could sell it. (Tr. at p. 99)

29. Mr. Harriman also credibly testified, and I find, that typically DCU did not notify its borrower when it sought to sell the borrower's loan and that this practice is the norm in the commercial lending industry. (Tr. at p. 22).

---

[8] Mr. Carey testified during the first day of the trial and as previously noted, the transcript of the first day of the trial is not currently available.

30. Mr. Harriman credibly testified, and I find, that it was DCU's practice not to offer a borrower the opportunity to purchase his own loans at a discount. (Tr. at p. 22)

31. Mr. Harriman credibly testified, and I find, that although DCU initially sought to sell the Village loan for $4 million, it ultimately sold it to WGC for approximately $2.5 million.[9] (Tr. at pp. 52-53, 70 and 82)

32. The loan documents between DCU and the Village provided that DCU could assign the Village loan to any party. (P-2, p. 17, ¶12)  The Lever Guaranty provided that the transfer or assignment of the notes operated as a transfer or assignment of the Lever Guaranty as well.  (P-3, p. 7, ¶16.4)

33. In January 2010, DCU informed Brian that it intended to sell the Village loan and offered Brian an opportunity to make a purchase offer. (Tr. at pp. 71-72)

34. On January 27, 2010, DCU and WGC entered into a Mortgage Loans Purchase and Sale Agreement with respect to the Village loan and on March 11, 2010, the sale closed.  (D-36 and Admitted Facts at ¶ 5)

35. By letter dated January 29, 2010, Lever's attorney proposed to DCU's attorney that an entity identified as Northborough Capital be given "a 30-day period of acceptance" for Northborough Capital to conduct due diligence in connection with the purchase of the Village loan for a price of $2.5 million. (D-39)

36. On April 23, 2010, the Village filed a voluntary chapter 11 petition in this court.  Its case was assigned docket number 10-42000-MSH (the "Village Bankruptcy Case"). (Admitted Facts at ¶ 10).

---

[9] The purchase price is redacted in the Mortgage Loans Purchase and Sale Agreement. (D-36) Mr. Harriman's testimony suggested that the purchase price was either $2.4 million or $2.5 million. The difference is not relevant to my decision.

37. On July 23, 2010, WGC was granted relief from the automatic stay in the Village's bankruptcy case permitting it to exercise its state law rights and remedies under its loan documents, including foreclosing the mortgage on the Gloucester real estate. (Admitted Facts at ¶ 11).

38. On November 4, 2010, the Village's chapter 11 case was converted to a case under chapter 7 and Gary Weiner was appointed chapter 7 trustee.

39. The Village, Lever and Brian on the one hand and DCU and WGC on the other have been involved in extensive state court litigation. Three actions were pending at various times in Essex County Superior Court, including *Lever Development, LLC v. Digital Federal Credit Union, et al.*, Civil Action No. ESCV 2010-366-C (the "Lever Essex Litigation"). (Docket # 38) Two companion cases brought by the Village and Brian were also filed in Essex Superior Court ─ *The Village of West Gloucester, LLC v. Digital Federal Credit Union et al.*, Civil Action No. ESCV 2010-367-C and *Brian Lever v. Digital Federal Credit Union et al.*, Civil Action No. ESCV 2010-368-C. (Docket # 38 and the Village Bankruptcy Case docket # 157) Another lawsuit, *West Gloucester Capital, LLC v. Brian Lever, et al.*, MICV10-1416 (the "Middlesex Litigation"), was filed in Middlesex County Superior Court by WGC to collect under Brian's guaranty acquired from DCU.[10] (Docket #31 at exhibit 2)

40. In June 2010, the Village chapter 7 trustee, DCU, WGC and its affiliates reached an agreement that included a settlement of their respective claims (the "Village Settlement"). A motion to approve the Village Settlement (the Village Bankruptcy Case docket # 157) was filed in the Village's chapter 7 case on June 11, 2011, and a copy served on Lever,

---

[10] Lever was not sued under the Lever Guaranty but was named as one of several reach and apply defendants in the Middlesex Litigation.

8

among others. No objection to the motion was filed and the Village Settlement was approved on July 26, 2011. (the Village Bankruptcy Case docket #157). The Village Settlement provided that the chapter 7 trustee would deliver to DCU and WGC a stipulation of dismissal with prejudice in connection with the Village's litigation then pending in Essex Superior Court in exchange for a payment by DCU or WGC to the trustee of $10,000.

41. In the Lever Essex Litigation, Lever asserted claims against both DCU and WGC for trespass, conversion, replevin/redelivery of goods pursuant to MASS. GEN. LAWS ch. 214, § 3, interference with advantageous contractual and business relationships and violations of MASS. GEN. LAWS ch. 93A. (Docket #39- Essex Litigation Verified Complaint)

42. All claims asserted in the Lever Essex Litigation against WGC were dismissed with prejudice by the Findings, Rulings and Order of the Honorable Robert A. Cornetta, dated September 21, 2011 (the "Lever Essex Litigation Order"). Lever has not provided any evidence that the order is under appeal.

43. As of November 1, 2011, the amount owed by Lever pursuant to the Lever Guaranty was $6,085,159. (P-8)

44. On November 2, 2011, the petitioning creditors filed the involuntary chapter 7 petition against Lever in this court. Lever does not dispute the claims of Harvey or Laushine.[11] (Admitted Facts at ¶¶ 1 and 2)

---

[11] On April 25, 2012, WGC filed a notice of an additional petitioning creditor, Matt Grinkas, the owner of Green Star Landscape, who wished to be added as a creditor. Mr. Grinkas subsequently withdrew as a petitioning creditor.

9

**Procedural Posture**

On November 28, 2011, Lever filed a motion to dismiss the involuntary petition alleging, among other things, that because of bona fide disputes regarding WGC's and Harvey's claims, there were insufficient petitioning creditors to maintain the involuntary petition. As noted above, Lever has since acknowledged the validity of Harvey's amended claim. On January 6, 2012, I denied Lever's motion to dismiss. Lever subsequently filed an answer to the involuntary petition that raised primarily the same issues that were raised in its motion to dismiss. Because Lever disputes that WGC is not eligible to be a petitioning creditor under Bankruptcy Code § 303(b)(1), a trial was scheduled to determine whether WCG's claim is in bona fide dispute and whether an order for relief should enter against Lever.

Prior to the trial, WGC filed a Motion to Preclude Evidence. In the Motion to Preclude, WGC argued that Lever had sought discovery of "among other things, issues surrounding DCU's relationship with WGC prior to WGC's purchase of the DCU loan, issues relating to DCU's seizure of the Project and issues relating to DCU's and/or WGC's entry onto the Project." WGC argued that evidence related to the foregoing was irrelevant because WGC's claim was based upon the Lever Guaranty. In addition, WGC maintained that Lever could not by law assert claims belonging to the primary obligor, namely the Village, or any other obligated party because the Village's claims had been released under the Village Settlement and because Massachusetts law prohibited a guarantor from raising defenses belonging to the primary obligor. Lever objected to the Motion to Preclude asserting, among other things, that to prove WGC's claim was in dispute it could still assert the claims it asserted in the Middlesex Litigation, and described those claims as "among other causes of action, interference with contractual relations, interference with advantageous relations, conversion and violations of

10

M.G.L. c. 93A, § 2." Although these claims appear to be the same as those Lever asserted in the Lever Essex Litigation, Lever also argued that it had newly discovered evidence that gave rise to additional claims. With the possible exception of accusations of collusion between DCU and WGC to oust the Village so that WGC could take over as developer of the project, however, it did not identify any new claims which it might assert.

At the hearing on the Motion to Preclude, WGC presented a copy of the verified complaint that Lever had filed in the Lever Essex Litigation as well as the September 21, 2011 Lever Essex Litigation Order granting summary judgment in favor of WGC and against Lever, including with respect to Lever's claims for trespass, conversion, replevin, interference with advantageous and contractual business relationships and for unfair and deceptive acts or practices under MASS. GEN .LAWS ch. 93A.[12] Lever's claims against WGC were dismissed with prejudice in the Lever Essex Litigation (Docket ## 38, 39).[13]

The Motion to Preclude was granted, but Lever was permitted to assert claims at trial on the involuntary petition that had not been asserted in the Lever Essex Litigation or the Middlesex Litigation. It is unclear, however, what claims, if any, Lever asserted in the Middlesex Litigation beyond those identified in its opposition to the Motion to Preclude and whether any of those claims, if they exist, survive in light of the *res judicata* effect of the Lever Essex Litigation Order.

---

[12] The Lever Essex Litigation Order states that the two companion cases were resolved by the parties by stipulations of dismissal, an apparent reference which includes the stipulation filed as a result of the Village Settlement with the Village trustee.

[13] The same claims were asserted by Lever in the Middlesex Litigation and according to WGC are subject to the *res judicata* effect of the judgment against Lever in the Lever Essex Litigation. WGC's position appears justified in light of Lever's own description, in its opposition to the Motion to Preclude, of the causes of action it states it could bring in the Middlesex Litigation.

Following the order on the Motion to Preclude, Lever and WGC engaged in further discussions regarding the conduct of the trial on the involuntary petition. They presented an agreement in open court whereby they agreed that: (a) Lever waived any challenge to Harvey's and Laushine's claims; (b) WGC would not challenge the withdrawal of Matt Grinkis' joinder of the involuntary petition; and (c) the sole issue at trial would be whether WGC and DCU colluded such that the Lever Guaranty would be vitiated.[14]

## Conclusions of Law

Section 303(b) of the Bankruptcy Code provides that an involuntary petition may be filed by three creditors who hold claims that: (a) are not contingent as to liability or the subject of bona fide dispute as to liability or amount, and (b) aggregate at least $14,425. *See* 11 U.S.C. § 303(b).

It is conceded that Laushine and Harvey hold undisputed claims against Lever that exceed, in the aggregate, $14,425. At the conclusion of the first day of trial I ruled that WGC had established a prima facie claim against Lever for $6,085,159 pursuant to the Lever Guaranty and thus the burden of proving the existence of a bona fide dispute shifted to Lever. *See In re Dilley*, 339 B.R. 1 (1st Cir. B.A.P. 2006).

When determining whether a bona fide dispute exists, courts generally apply an objective standard so that once prima facie claims have been established a debtor may not rely on mere denials as to the validity of a claim. *Id.* at 6. "Instead, a debtor must demonstrate that there are substantial factual or legal questions that bear upon his liability." *Id*. Allegations in pleadings do

---

[14] Section 303(h)(1) also requires a determination that the alleged debtor is not paying its undisputed debts as they become due. Lever has not alleged it is paying its debts as they become due and has conceded that both Laushine and Harvey hold unpaid claims against it. By agreeing that the sole issue at trial is whether DCU and WGC colluded, I find Lever has waived any argument that it is paying its undisputed debts as they become due.

12

not rise to the level necessary to establish the existence of a bona fide dispute. *Id.* ("Mere denial of claim's validity is not sufficient . . .'" to establish bona fide dispute) *citing In re Narragansett Clothing Co.*, 143 B.R. 582, 583 (Bankr. D.R.I. 1992). Under the objective standard if there is a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to the undisputed facts, then the petition must be dismissed. *Id.* Lever cannot rely on the claims it asserted against WGC in the Lever Essex Litigation, which included conversion, trespass, interference with Lever's contractual relationship with the Village and violations of M.G.L. c. 93A, to establish a bona fide dispute of WGC's claims because final judgment has entered in the Lever Essex Litigation in favor of WGC and thus Lever is bound by the doctrine of *res judicata*. Nor can it assert any claims previously asserted by the Village against WGC.  First, those claims were released pursuant to the Village Settlement.  "Generally, a court-approved settlement receives the same *res judicata* effect as a litigated judgment . . . ." *In re Medomak Canning*, 922 F.2d 895, 900 (1st Cir. 1990).  Second, under Massachusetts law, a guarantor who executes an unconditional guaranty may not assert, as a defense to liability under the guaranty, claims or defenses belonging to the primary obligor because the guarantor's obligation under an unconditional guaranty is separate from the obligation of the primary obligor under a note. *SKW Real Estate Limited Partnership v. Gold*, 428 Mass. 520, 521, 702 N.E.2d 1178  (1998). Indeed, [t]here is no statutory obligation on the part of a foreclosing mortgagee to notify guarantors because the liability of a guarantor does not flow from an obligation secured by a mortgage of real estate but is independent of that obligation. *SKW Real Estate Limited Partnership*, 428 Mass. at 523, 702 N.E.2d at 1181 (internal citation and quotation marks omitted).

Lever argues that if "illegal or improper" actions of a lender triggered the primary obligor's default, a guarantor is excused from his obligations under the guaranty. Lever claims that is what occurred here. Lever asserts that DCU colluded with WGC to engineer a default by the Village of its obligations under the loan documents and Forbearance Agreement so that WGC could purchase the Village loan and ultimately step into the role of developer of the condominium project.

The evidence before me does not support Lever's version of the facts. The Village's defaults under the loan documents and the Forbearance Agreement were entirely of its own making. There is no evidence that Brian's wife ever made a contribution from her 401(k) plan to cover certain payables as required in the Forbearance Agreement. Furthermore, the Reserve Account requirement in the Forbearance Agreement was absolute and, contrary to Lever's suggestion at trial, not tied to revenues from unit sales or any other source. The Village was required to maintain a minimum amount in the Reserve Account and failed to do so. The fact that the Village was counting on funding the Reserve Account from proceeds of unit sales and those sales failed to materialize is irrelevant. Finally, Lever was required at all times to maintain a loan to value ratio of no more than 75%. With a loan balance of approximately $6.9 million in December 2009, this means the value of the Gloucester real estate collateral needed to be at least $9.2 million, far in excess of the high-side value of $4 million stated in the October 5, 2009 Collier Meredith & Grew appraisal.

Lever claims that DCU breached its obligations under the Forbearance Agreement by refusing to approve the sales of units 2 and 8. Even if this were true, it would not, under the terms of the Forbearance Agreement, have excused the Village from the independent obligation to fund the Reserve Account. In any event, the record does not support Lever's claim that DCU

14

interfered with the Village's sale of units. The Forbearance Agreement required the Village to sell units 2 or 7 by December 31, 2009. The Village failed to do so through no fault of DCU.

The evidence establishes that the Arsenaults, who signed a reservation agreement to purchase unit 2 on October 17, 2009, could not close on the unit until they sold their home in Winchester and that the Village notified DCU that a 2009 closing was unlikely. DCU had no obligation to agree to a sale after December 31, 2009. Even the Village's proposal for a 2009 sale to the Arsenaults with a lease back to the Village of the unit until the sale of the Arsenaults' Winchester property could be arranged would not have complied with the requirements of the Forbearance Agreement. The Village called this proposal "marketing creativity" (P-22) but it could just as easily be called a sham transaction.

The evidence further establishes that the Burkes, who signed a purchase and sale agreement on November 7, 2009 to purchase unit 8, agreed to a closing in May 2010. Furthermore, the purchase price under the agreement with the Burkes was $600,000. In the Forbearance Agreement the Village agreed that no unit could be sold for less than $700,000 without prior written consent of DCU.

The attempts by the Village to circumvent the unit sale requirements under the Forbearance Agreement coupled with the outright defaults of the requirement to fund the Reserve Account, to maintain a loan to value ratio of no more than 75% and for Brian's wife to inject her funds, more than justified DCU's decision to call a default under the Forbearance Agreement on December 1, 2009.

There is also no evidence in the record to support Lever's allegation of collusion between DCU and WGC to divest the Village of the development project. DCU was completely within its right to sell the Village loan to whomever it chose. The record reflects that it solicited offers

15

from approximately six potential purchasers in addition to WGC. DCU had no obligation under law or contract to notify the Village, Lever or Brian of its plans to sell its loan or to offer any of them an opportunity to bid on the loan. In fact the testimony of both Messrs. Carey and Harriman of DCU established that it was DCU's policy **not** to sell loans at a discount to its borrowers.

At trial, Lever's counsel attempted repeatedly to elicit testimony from Messrs. Carey and Harriman of DCU and Mr. Smith of WGC as to discussions between DCU and WGC about WGC's requirement that it become the "developer" of the condominium project. All such attempts were unsuccessful. No credible evidence has been adduced as to what WGC's objectives were in purchasing the Village loan, never mind that WGC and DCU somehow colluded to achieve those objectives.

Despite DCU's policy not to offer its borrowers the opportunity to purchase their loans at a discount, in January 2010, DCU did make such an offer to Brian which resulted in the January 29, 2010 letter from Lever's attorney offering to purchase the Village loan for $2.5 million. While Lever faults DCU for failing to accept the Village's offer to purchase its loan the offer as reflected in the January 29, 2010 letter from the Village's attorney is so vague and uncertain as to hardly qualify as an offer at all. It brings to mind Justice Holmes' observation that "[l]awyers spend a great deal of their time shoveling smoke." The "offer" is nothing more than a request for 30 days to enable Northborough Capital to conduct due diligence to determine its willingness to fund a $2.5 million purchase of the Village notes. At the point DCU received this offer it had already entered into a loan purchase and sale agreement with WGC. Why DCU should be faulted for not dropping its bird-in-the-hand WGC deal for the two-in-the-bush Village "offer," Lever does not articulate nor does the record before me disclose.

Based upon the evidence submitted, including the testimony of the witnesses whose behavior and demeanor I observed, and applying the standards applicable to this dispute, I conclude that Lever has failed to carry its burden that the claim of WGC is subject to a bona fide dispute.

A separate order for relief shall enter.

Dated: October 18, 2012

Melvin S. Hoffman
US Bankruptcy Judge

Counsel of record:
    Jennifer Roberts
    LaTanzi, Spaulding & Landreth
    Orleans, MA
    For West Gloucester Capital, LLC

    Ethan Jeffery
    Murphy & King, P.C.
    Boston, MA
    For the petitioning creditors, Laushine Enterprises, LLC, Harvey Building Products
    and West Gloucester Capital, LLC

    Mark Nestor
    Gloucester, MA
    For Lever Development, LLC